### RURAL IOWA INDEPENDENT TELEPHONE ASSOCIATION, Plaintiff,

v.

### IOWA UTILITIES BOARD, Defendant,

Qwest Corporation, Intervenor.

No. 4:02 CV 40348.

United States District Court,
S.D. Iowa,
Central Division.

Aug. 11, 2005.

Thomas G. Fisher Jr., Attorney at Law, Des Moines, IA, for Plaintiff.

Allan Kniep, David Jay Lynch, Iowa Utilities Board, Dept. of Commerce, Des Moines, IA, for Defendant.

Amy M. Bjork, Dennis Wayne Johnson, Sheila K. Tipton, Dorsey & Whitney LLP, Des Moines, IA, Bobbee Joan Musgrave, Steven James Perfrement, Musgrave & Theis LLP, Joseph V. Hatala, Qwest Corporation, Roy E. Hoffinger, Perkins Coie LLP, Denver, CO, David S. Sather, Littleton, CO, for Intervenor.

## ORDER ON MOTION BY INTERVENOR AND DEFENDANT FOR SUMMARY JUDGMENT

GRITZNER, District Judge.

This matter is before the Court on the Motion for Summary Judgment filed by Intervenor (Clerk's No. 51) and joined by Defendant (Clerk's No. 53). Attorney for Plaintiff is Thomas G. Fisher; attorney for Defendant is David J. Lynch; attorneys for Intervenor are Sheila K. Tipton, Dennis W. Johnson, Amy M. Omvig, and Roy E. Hoffinger. A hearing on the motion was held March 1, 2005, and the Court considers the motion fully submitted and ready for ruling.

### PROCEDURAL HISTORY

Plaintiff, Rural Iowa Independent Telephone Association ("RIITA"), commenced this action against Defendant, the Iowa Utilities Board ("the IUB" or "the Board"), in this Court on July 19, 2002.[1] Qwest Corporation ("Qwest") moved to intervene on October 1, 2002, and its motion was granted on October 25, 2002.

This Court[2] granted a motion to dismiss in an order filed December 3, 2002, solely

---

1. Board members Dianne Munns, Mark O. Lambert, and Elliot Smith were also named individually and in their official capacity as Defendants in the original Complaint.

2. The Honorable Robert W. Pratt. In an order filed July 6, 2004, Magistrate Judge Celeste Bremer denied Intervenor's motion to consolidate with another case before this Court, *INS v. Qwest*, No. 4:02–cv–40156, finding there is not a sufficient number of common legal and factual questions. Judge Bremer did, however, find "it is clear these two cases need to be coordinated in order to maximize efficiency." She then ordered the instant case reassigned to the undersigned judge.

on the Hobbs Act argument asserted by Qwest. The Eighth Circuit reversed and remanded the District Court's order, stating that "RIITA challenges the IUB's *interpretation* of [an FCC] order, ... [and] district courts have jurisdiction to determine whether a state administrative agency correctly interprets federal law ...." *Rural Iowa Indep. Tel. Ass'n v. Iowa Utils. Bd.*, 362 F.3d 1027, 1030 (8th Cir. 2004) (citing *Verizon Maryland Inc. v. Public Serv. Comm'n of Maryland*, 535 U.S. 635, 643–44, 122 S.Ct. 1753, 152 L.Ed.2d 871 (2002), and *Pac. Bell v. Pac-West Telecomm., Inc.*, 325 F.3d 1114, 1125 (9th Cir.2003)).[3] The parties resolved remaining issues in the remanded motion to dismiss.[4] On November 4, 2004, Qwest filed a motion for summary judgment, which was subsequently joined by the IUB.[5] RIITA has resisted the motion.

## BACKGROUND FACTS

### A. Preliminary Statement

This case concerns intercarrier compensation for telephone calls ("traffic") placed by customers of third-party commercial mobile radio service ("CMRS") providers (i.e., "wireless carriers")[6] to end-user customers served by third-party Incumbent Local Exchange Carriers ("ILECs")[7] located in the same calling area.[8] The calls at issue are (1) placed (i.e., "originated") by end-user customers of third-party wireless carriers, (2) delivered by the wireless carriers to Qwest, (3) transported approximately six blocks by Qwest and delivered to Iowa Network Services ("INS")[9], (4) transported by INS to the ILECs serving the called parties, and (5) routed and delivered (i.e., "terminated") by the ILECs to the premises of the called parties (i.e., the ILECs' end-user customers). RIITA is an ILEC involved in terminating the calls to its subscribers.[10] Qwest and INS are in-

3. In remanding the case, the Eighth Circuit instructed this Court to consider whether the Board properly interpreted the FCC's decision. The Eighth Circuit refrained from addressing the merits of the Board's interpretation.

4. The parties stipulated to dismissal of the individual board members in exchange for the IUB accepting federal jurisdiction over this action.

5. The IUB joined completely Qwest's motion for summary judgment but did file a separate reply to RIITA's resistance.

6. In the telecommunications industry, wireless carriers are called Commercial Mobile Radio Service or "CMRS" providers who essentially offer one-way or two-way radio communication services between land stations and mobile receivers. *See* 47 C.F.R. § 20.3.

7. *See* 47 U.S.C. § 251(h)(1) (defining an incumbent local exchange carrier to mean with respect to a given area, the local exchange carrier that "on the date of enactment of the Telecommunications Act of 1996, provided telephone exchange service in that area").

8. Whether this traffic is "local" or "long distance" is an issue resolved by the Board and attacked by RIITA in this action.

9. INS was founded and is currently owned by Iowa ILECs, including RIITA.

10. While the largest portions of the IUB's rulings relate to inbound traffic (i.e., from wireless carriers to wireline carriers), RIITA wants to differentiate between these types of calls and outbound traffic (i.e., wireline carriers to wireless carriers). RIITA asserts the Board erred in concluding the wireline carriers could not use interexchange carriers ("IXCs") for outbound traffic, regardless of whether local or long distance. RIITA asserts it should be able to charge for access services for all outbound traffic. *See In re TSR Wireless, L.L.C. v. U.S. West Communications, Inc.*, 15 FCC Rcd. 11166, ¶ 31 (2000) ("Such traffic falls under our reciprocal compensation rules if carried by the incumbent LEC, *and under our access charge rules if carried by an interexchange carrier.* This may result in the same call being viewed as a local call by the carriers and a toll call by the end user.").

The Board disputes RIITA's assertions and contends it did not commit error regarding the assessment of outbound traffic. The Board asserts the FCC decisions were clear in-

volved in the transport of these calls because the originating third-party wireless carriers and the terminating ILECs have elected to "interconnect" their networks "indirectly" to permit calls between their end-user customers.[11]

## B. Plaintiff's Challenge

In its Complaint before this Court, RIITA alleges the IUB issued a series of orders in docket number SPU–00–7 that misinterpret and misapply various provisions of the Telecommunications Act, in particular section 251, and the result is to deprive rural ILECs such as RIITA of their property without just compensation. Pursuant to 47 U.S.C. § 252(e)(6), RIITA

is challenging the Board's determinations that (a) wireless calls that are placed and received by subscribers of different carriers located in the same major trading area ("MTA")[12] are classified as "local" and are not subject to long distance access charges, notwithstanding the fact that the originating and terminating carriers are interconnected indirectly through one or more additional carriers; (b) the termination of such calls is subject to the "reciprocal compensation" provisions of 47 U.S.C. § 251(b), as implemented through negotiated or arbitrated interconnection agreements between the originating and terminating carriers pursuant to 47 U.S.C. § 252; and (c) Qwest, which provides an

---

that *any* intraMTA calls are "local" and therefore "subject to transport and termination rates under section 251(b)(5), rather than interstate and intrastate access charges." *IUB Proposed Decision,* at 33 (citing *Implementation of the Local Competition Provisions of the Telecommunications Act of 1996, Interconnection between Local Carriers and Commercial Mobile Radio Service Providers, First Report and Order,* 11 FCC Rcd. 15499, ¶¶ 1036 (1996) (hereinafter *"Local Competition Order"*)); *see also Local Competition Order,* at ¶ 1043 ("We reiterate that traffic between an incumbent LEC and a CMRS network that originates and terminates within the same MTA (defined based in the parties' locations at the beginning of the call) is subject to transport and termination rates under section 251(b)(5), rather than interstate and intrastate access charges.").

The Board points out that these decisions do not distinguish whether the traffic originates with a customer of the wireline carrier (outbound traffic) or with the customer of the wireless carrier (inbound traffic). Instead, these statements indicate all intraMTA calls are local and not subject to access charges. No FCC statements to the contrary were cited to the Board, and the IUB asserts it cannot be error for the agency to base its decisions on the record before it. Since *TSR Wireless* was issued while the matter was before the Board, the IUB argues that if, in RIITA's opinion, it requires a different result than that reached by the Board, RIITA should raise that case with the parties during negotiations or pres-

ent the FCC's *TSR Wireless* order to the Board for its consideration in an appropriate proceeding.

11. The term interconnection is used by regulators and carriers to refer to the physical linking and use of networks owned by different carriers, to permit customers of one carrier to call customers of another carrier, and interconnection may be either direct or indirect. "Interconnection is direct when the carrier's facilities or equipment is attached to another carrier's facilities or equipment," and "indirect when the attachment occurs through the facilities or equipment of an additional carrier." *Order on Reconsideration, Deployment of Wireline Services Offering Advanced Telecommunications Capability,* CC Docket No. 96–98, 15 FCC Rcd. 17806, ¶ 85 n. 198 (2000).

12. In the field of wireless telecommunications, the major trading area (MTA) is the local calling area for wireless telecommunication providers. *See* 47 C.F.R. § 51.701(b)(2). MTAs are determined pursuant to administrative regulations promulgated by the FCC. 47 C.F.R. § 24.202. "IntraMTA" wireless traffic originates and terminates in the same MTA. "InterMTA" wireless traffic originates in one MTA and terminates in another. In Iowa, the MTA for wireless telecommunications is called the Des Moines MTA and encompasses nearly all of the state of Iowa, as well as parts of Michigan, Illinois, Missouri, Nebraska, and South Dakota.

indirect interconnection and transiting service between the CMRS provider and INS, is not responsible for payment to the ILECs of access charges or other compensation for their termination of calls placed by subscribers of the CMRS providers.[13]

## C. Telecommunications in Iowa

RIITA is an association of small rural independent telephone companies. RIITA was a party to the IUB action and represents approximately 130 rural Iowa companies, all of which receive the type of traffic at issue here. The IUB, the only remaining Defendant,[14] is the board charged with governing telecommunications in Iowa, so far as it is granted the authority to do so. Qwest, formerly known as U.S. West, is the Intervenor in this case. Qwest is the former Regional Bell Operating Company in the state of Iowa.

Due to the largely rural nature of Iowa, telecommunications service in much of the state has historically been provided by small independently-owned companies located in and serving small designated geographic areas. These phone companies provide local telephone services, called "telephone exchange service", within a defined geographic area known as the local exchange. Providing such services made these local phone companies "local exchange carrier[s]" ("LECs").[15] Many, if not all, of these Iowa LECs were independently owned. Qwest, which provides local telephone services to customers throughout a fourteen-state area, is also an LEC, though not independently owned. Though

differing greatly in size, Qwest and the independent LECs provide basically identical services.[16]

Typically, LECs own the wires, computer switches, and other facilities necessary to provide telecommunications service to their subscribing customers. Access services or exchange services were available for purchase to competing carriers, thereby allowing purchasers to send or receive calls from a subscriber over the facilities owned and maintained by another LEC. The major benefit of purchasing access was that a company could reach specific phone customers by purchasing access to the LEC circuits without having to build facilities throughout an area served by another LEC.

In 1987, most of the independent LECs then in existence in Iowa joined together to form Iowa Network Services ("INS"). The major benefit of this formation was that calls placed to or from a customer served by one of the companies in INS could now utilize INS' network to reach whichever independent LEC the customer subscribed to through INS' one centralized network. As was customary, INS charged access fees to use its network, fees set forth in tariffs on file with the Federal Communications Commission ("FCC"), which governed INS' interstate services, and tariffs on file with the IUB, which governed INS' intrastate services.

As long as telephone calls were placed from traditional land-based wire connected

**13.** Qwest takes no position and does not seek summary judgment on any claim by RIITA regarding charges to end-users.

**14.** In its original Complaint, RIITA also named as Defendants Dianne Munns, Mark O. Lambert, and Elliot Smith individually and in their respective official capacities as members of the IUB. In settling several issues before the Court in a motion to dismiss, the parties agreed to drop the Board members from the

suit in exchange for the Board consenting to jurisdiction of this Court. RIITA subsequently filed an Amended Complaint.

**15.** *See* 47 U.S.C. § 153(26) (defining "LEC" as any person that is engaged in the provision of telephone exchange service or exchange access).

**16.** Qwest also offers long distance services.

phones, the system of ordering access to the INS network detailed above worked well. Technology had an impact on the development and popularity of wireless cellular phones, however, and as the popularity of wireless phones grew, so too did ambiguities surrounding the access services and charges associated with accessing the INS network.

Traditionally, when a call begins at a third-party wireless caller's phone, the call is connected by radio signal to the wireless service provider. The call then travels over the wireless carrier's network until it interconnects with Qwest's network/facilities. Qwest then transports the call on its network to a point of interconnection with INS, with INS carrying the call over its network to a point of interconnection with the independent LEC network serving the person being called. In short, as relevant to the present action, Qwest delivers to the INS network wireless phone calls originated by customers of third-party CMRS carriers who are calling subscribers of independent local exchange carriers such as RIITA, and whose calls originate and terminate in the same MTA. Until 1999, Qwest paid the tariffed rates for taking the wireless-originated calls from non-Qwest customers and delivering them to the independent LECs via the INS network pursuant to either the INS intrastate tariffs filed with the IUB or INS interstate tariffs on file with the FCC.

## D. The Telecommunications Act [17] and FCC Implementing Decisions

For services provided in the state of Iowa, the IUB regulates the telecommunications industry and other public utilities through tariffs, or regulations of utility rates and services. *See Teleconnect Co. v. U.S. West Comm'n. Inc.,* 508 N.W.2d 644, 646 (Iowa 1993); *see also* Iowa Code § 476.1 (delegating to the utilities board the authority to "regulate the rates and services of public utilities"). Every public utility doing business in Iowa must "file with the board tariffs showing the rates and charges for its public utility services" under this regulatory scheme, and every public utility "shall keep copies of its tariffs open to public inspection under such rules as the board may prescribe". *Id.* (citing Iowa Code § 476.4). Based on this structure, the Iowa Legislature implemented various rules and definitions found in the Iowa Administrative Code to guide the Board in regulating the telecommunications industry in Iowa. *See,* 199 Iowa Adm.Code 38.1(1).

In its *Local Competition Order,* the FCC found sections 251 and 252 applicable to the regulation of LEC–CMRS interconnection, concluding that these sections provide an "alternative basis for jurisdiction" to section 201 and 332. *Local Competition Order,* at ¶¶ 1022, 1023. The FCC observed that "all four sections are designed to achieve the common goal of establishing interconnection and ensuring interconnection on terms and conditions that are just, reasonable, and fair." *Id.*

---

**17.** The Act "is a unique hybrid of statutory and common law that divides decision making authority between the Federal Communications Commission ("FCC"), State commissions, and private parties." *Southwestern Bell Tel. Co. v. Connect Communications Corp.,* 72 F.Supp.2d 1043, 1044 (E.D.Ark. 1999), *rev'd on other grounds,* 225 F.3d 942 (8th Cir.2000). This structure governs the telecommunications companies doing business in Iowa. The FCC regulates interstate telephone service, while the IUB oversees intrastate service. *Compare* 47 U.S.C. § 152 (2002) (defining FCC's jurisdiction); *see also* 47 U.S.C. §§ 201–205 (indicating that the FCC has jurisdiction over interstate communication), *with* 47 U.S.C. § 253(b) (relating to State regulatory authority and discussing that nothing in this section shall affect the ability of a State to impose, on a competitively neutral basis and consistent with section 254 of this section, requirements necessary to preserve and advance universal service, and ensure the continued quality of telecommunications services); *see also* 47 U.S.C. § 261(b)-(c) (indicating Congressional intent with respect to existing and additional state requirements that "nothing in this part precludes a State from imposing requirements on a telecommunications carrier for intrastate services . . . as long as the State's requirements are not inconsistent with this part or the [FCC's] regulations").

■ Congress enacted the Telecommunications Act ("the Act" or "the 1996 Act")[18] in February 1996, greatly amending the Communications Act of 1934. Prior to the Act, when a new company entered a geographic area, it routinely had to compete with an established LEC for customers in that particular service area.[19]

at ¶1023. The FCC proceeded under sections 251 and 252 as applied to LEC–CMRS interconnection, *id.*, and did not invoke its jurisdiction under section 332. *Id.* at 1025.

**18.** *See* 47 U.S.C. §§ 151–615 (2001).

**19.** Prior to the 1996 Act, the FCC issued several decisions related to interconnection between wireless carriers and wireline local telephone companies (i.e., LECs) pursuant to section 201 of the Communications Act of 1934, 47 U.S.C. § 201. Specifically, the FCC held "the cellular carrier should be permitted to choose the type of interconnection", *Policy Statement, The Need to Promote Competition and Efficient Use of the Spectrum for Radio Common Carrier Services,* 59 RR2d, Appendix B, at ¶3; *see also Implementation of Sections 3(N) and 332 of the Communications Act,* 9 FCC Rcd. 1411, at ¶230 (1994) (hereinafter *"Section 332 Implementation Order"*) (finding it "in the public interest to require LECs to provide the type of interconnection reasonably requested by all CMRS providers"), though the wireline carrier was obligated only to provide "a form of interconnection no less favorable than that furnished to the wireline carrier." *NECA Exchange No. 9: Radio Common Carrier Services* 4 (National Exchange Carrier Ass'n, Inc.1992). The FCC also adopted the principle of "mutual compensation", meaning that wireless carriers and LECs were required to compensate one another for the transport and termination of calls originating on each other's networks. *Section 332 Implementation Order,* at ¶¶229–31, 233; *see also Declaratory Ruling, Need to Promote Competition and Efficient Use of Spectrum for Radio Common Carrier Services,* 2 FCC Rcd. 2910, ¶¶4, 6, 8, 12, 17, 21 (1987) (hereinafter *"Efficient Use of Spectrum"*).

In addition, the FCC required that the rates, terms, and conditions applicable to the exchange of traffic between end-user customers of wireless carriers and LECs be established through interconnection agreements, *Efficient Use of the Spectrum,* at ¶¶54–56; *Order on Reconsideration, Need to Promote Competition and Efficient Use of Spectrum for Radio Common Carrier Services,* 4 FCC Rcd.

2369, ¶¶10, 13–14 (1989) (hereinafter *"Order on Reconsideration"*), "if the non-wireline carrier chooses to negotiate such with the telephone company." *NECA Exchange No. 9: Radio Common Carrier Services* 4. The FCC stated that tariffs should be filed "only after the co-carriers have negotiated agreements on interconnection." *Efficient Use of the Spectrum,* at ¶56; *Order on Reconsideration,* at ¶¶13–14. The FCC instructed carriers to file complaints, not tariffs, if they were unable to negotiate agreements without regulatory intervention. *Efficient Use of Spectrum,* at ¶56; *Order on Reconsideration,* at ¶15.

Based on concerns about interference with its authority to regulate interconnection for the purpose of interstate traffic, in 1987 the FCC preempted state regulations of intrastate interconnection that are inconsistent with its "mutual compensation" and "negotiated agreement" requirements. *Efficient Use of the Spectrum,* at ¶21. With these exceptions, the FCC has refused to preempt state regulations addressed to interconnection between wireless carriers and LECs, reasoning that because wireless carriers are

primarily engaged in the provision of "local, intrastate, exchange telephone service, the compensation arrangements among [wireless] carriers and local telephone companies are largely a matter of state, not federal concern." The [FCC] further determined that these arrangements are "properly the subject of negotiations between the carriers as well as state regulatory jurisdiction."

Notice of Proposed Rulemaking, *In re Equal Access and Interconnection Obligations Pertaining to Commercial Mobile Radio Services,* 9 FCC Rcd. 5408, at ¶108 (1994) (hereinafter *"Equal Access NPRM"*) (quoting *Policy Statement, The Need to Promote Competition and Efficient use of the Spectrum for Radio Common Carrier Services,* 59 RR2d 1275, 1284–85 (1986)).

In 1993, Congress amended the 1934 Act as part of the Omnibus Reconciliation Act ("the Budget Act"), Pub.L. No. 103–66,107 Stat. 312 § 6002 (1993), by adding 47 U.S.C. § 332(c)(1)(B), which requires the FCC, upon the reasonable request of a CMRS provider,

The Act was intended to enhance competition in the market for local telephone service. *See AT & T Corp. v. Iowa Utils. Bd.,* 525 U.S. 366, 371, 119 S.Ct. 721, 142 L.Ed.2d 835 (1999). To break down barriers to competition in the local phone market, the Act requires all carriers to "interconnect, directly or indirectly" with other carriers. 47 U.S.C. § 251(a)(1).

The Act also established interconnection agreements, requiring ILECs to agree, upon request, to provide interconnection to a competing carrier pursuant to the interconnection agreement approved by a state public utility commission rather than pursuant to a tariff. *See* 47 U.S.C. §§ 251(c)(1) and 252. The Act further imposes a duty on all LECs "to establish reciprocal compensation arrangements for the transport and termination of telecommunications." *See* 47 U.S.C. § 251(b)(5). " '[R]eciprocal compensation' means that when a customer of one [LEC] calls a customer of a different [LEC] who is within the same local calling area, the first carrier pays the second carrier for completing, or 'terminating,' the call." *Pac. Bell,* 325 F.3d at 1119–20.

Thus, the Act's goal of fostering competition is furthered by allowing carriers to compete with ILECs by utilizing the ILECs' telecommunications networks, rather than forcing the competing carriers to build their own networks before serving a given area. The originating and terminating parties are then compensated according to the roles they play in the transport and termination of the traffic as provided in the interconnection agreement between the parties.

The 1996 Act also establishes a system of negotiation and arbitration in order to facilitate voluntary agreements between the competing carriers to implement its substantive requirements.[20] Under the 1996 Act, "all local exchange carriers are required to establish reciprocal compensation arrangements in their interconnection agreements." *Id.* at 1119 (quotations and citations omitted). Negotiation is triggered by a carrier making a bona fide request ("BFR") to enter into an interconnection agreement for the exchange of local traffic.[21] 47 U.S.C. § 252(a)(1).

---

to order a common carrier to provide interconnection in accordance with the procedures specified in section 201 of the 1934 Act. *See* 47 U.S.C. § 332(c)(1)(B). The Budget Act preempted state regulation of market entry and rates charged by wireless carriers, but otherwise expressly preserved state jurisdiction over intrastate wireless carriers, services, and tariffs. *See* 47 U.S.C. § 332(c)(3).

In 1994, the FCC adopted an order implementing section 332, and holding that section 332 did not "limit or expand the [FCC's] authority to order interconnection pursuant to the [1934] Act." *Section 332 Implementation Order,* at ¶ 220. The FCC reiterated its prior requirement that carriers enter into interconnection agreements providing for mutual compensation. *Id.* at ¶¶ 229, 232. The FCC also required LECs to "establish reasonable charges for interstate interconnection provided to [CMRS] licensees." *Id.* at ¶ 233. Again, the FCC refused "to preempt state

regulation of LEC intrastate interconnection rates." *Id.* at ¶ 231.

RIITA objects to this information on the basis that there are no wireless carriers participating in this case. However, RIITA seems to overlook that the central issue in this case is the IUB'a interpretation of federal law, which does impact wireless carriers. The Court therefore includes this discussion related to regulation of LEC–CMRS interconnection prior to the 1996 Act for background and to understand the conclusions reached by the IUB in its orders at issue here.

20. This system is similar in structure to that adopted by the FCC prior to passage of the 1996 Act. *See* discussion *supra,* at footnote 19.

21. Though historically non-ILECs cannot be compelled to negotiate by delivering a BFR because they have no duty to exchange local traffic, *see* 47 U.S.C. § 252(a)(1), the current trend seems to permit, and even require nego-

Once negotiations begin, both the ILEC and the other carrier "have a duty to negotiate in good faith the terms and conditions of an agreement that accomplishes the Act's goals." *Iowa Utils. Bd. v. FCC,* 120 F.3d 753, 792 (8th Cir.1997) (citing 47 U.S.C. §§ 252(c)(1), 252(a)(1)). If the parties fail to reach an agreement through voluntary negotiations, either party may petition the relevant state public utility commission to arbitrate and resolve any open issue. 47 U.S.C. § 252(b). The final agreement, whether negotiated or arbitrated, must be approved by the state commission. *Id.* (citing 47 U.S.C. §§ 252(b), 252(e)(1)).

Due to the complexity of the Telecommunications Act, the FCC created an order directing the implementation of the Act. *See Local Competition Order,* at ¶¶ 1035–1045. In that order, the FCC addressed the applicability of the 1996 Act to particular types of calls, including calls originated by end-user customers of CMRS providers, of the Act's provisions regarding "transport" [22] and "termination", and the formation of interconnection agreements. *Id.* Relevant to this case, the *Local Competition Order* specifically addressed the billing of calls that a wireless carrier delivers to an LEC for termination, where the call both originates and terminates in a geographic area, i.e., the MTA. *See id.*

In early 1999, Qwest stopped paying access charges to INS for the intraMTA wireless traffic of third parties that Qwest delivered to the independent LECs via the INS network based on the FCC determinations made in the *Local Competition Order.* Qwest believes the FCC determined that traffic between an LEC and a CMRS provider that at the beginning of the call originates and terminates within the same Major Trading Area is local traffic and therefore not subject to access charges. *See id.* at ¶ 1036.

## E. Decisions of the IUB

This case involves the manner in which telephone traffic is exchanged by small local rural telephone companies, also known as independent or rural ILECs [23] and wireless telephone companies through the telephone network owned and operated by Qwest. In April 1999, Qwest advised INS and the terminating ILECs that, as a transiting carrier, it was not responsible for paying "access" charges or other compensation for their transport and termination of calls placed by customers of third-party CMRS providers. INS and the terminating ILECs disagreed with Qwest's position.

Consequently, on May 19, 2000, Qwest filed a petition with the IUB for a declaratory order regarding the exchange of local traffic between cellular telephone companies and other local service providers using Qwest's facilities. The Board docketed the petition as a formal contested case pro-

---

tiation by non-ILECs. *See* discussion *infra,* at Analysis section C.

**22.** In its discussion of "transport," the FCC noted that "[m]any alternative arrangements exist for the provision of transport between the two networks," and that these arrangements include "dedicated circuits provided either by the incumbent ILEC, the other local service provider, separately by each, or jointly by both," and "facilities provided by alternative carriers." *Local Competition Order,* at ¶ 1034.

**23.** Qwest is also an ILEC but is not independent or rural and thus not a "rural ILEC." *See INS v. Qwest,* 363 F.3d 683, 694 n. 3 (8th Cir.2004) ("Although Qwest serves as an LEC in certain communities to the extent it provides local telephone service, and may even be an ILEC, ... it served neither function with respect to the traffic here at issue. The CMRS traffic was not directed to any of Qwest's local telephone customers; rather, Qwest served merely as an intermediary carrying the traffic on its route to INS's member companies' local telephone customers.").

ceeding pursuant to Iowa Code §§ 17A.12 and 476.3, and identified the contested case as Docket No. SPU–00–7.[24] The Board granted motions to intervene filed by RIITA, the Iowa Telephone Association ("ITA"),[25] several Iowa independent ILECs, INS, and several CMRS providers.

All parties involved in the IUB action had a chance to file initial briefs and reply briefs, and the Board held a "technical workshop". Hearings presided over by all three Board members lasted several days and concluded on April 19, 2001. On November 26, 2001, the IUB issued a Proposed Decision and Order (hereinafter *"IUB Proposed Decision"*).

Briefly, the Board's decision concerns telephone traffic between a cellular telephone customer and a customer of an independent telephone company. Prior to the decision of the Board, if the cellular customer placed a call to a customer of an independent telephone company, the cellular company delivered the call to Qwest. Qwest then transported the traffic to INS, a centralized equal access service provider. INS then carried the call to the independent telephone company for connection to the called customer. Qwest charged the wireless company a transit fee for carrying the traffic. INS charged an access service fee to Qwest for carrying the traffic. The independent telephone company then assessed access charges to Qwest for terminating the call.

In the proposed decision and order issued November 26, 2001, by the IUB, the Board's presiding officer found that the cellular traffic at issue is local and that access charges do not apply to such traffic. This decision was made pursuant to the Board's understanding of orders issued by the FCC. The IUB held cellular carriers are entitled to interconnect directly with the independent carriers on a bill-and-keep basis pursuant to Board and FCC rules. The decision further found Qwest is entitled to compensation for carrying the traffic but has no obligation to pay access or other terminating fees. If the cellular companies want to use INS facilities for an indirect connection to the independent companies, they may do so, but INS is entitled to compensation for providing those services. The Board found it could not determine the appropriate rate for INS' services on the record before it. As a result, the Board directed the parties to negotiate an interconnection agreement regarding these matters pursuant to the Telecommunications Act.[26] Board arbitra-

---

**24.** Qwest's petition was apparently based on the *Local Competition Order*. After examining Qwest's request, the IUB found numerous facts to be in dispute and also found that "broad" issues regarding the proper treatment of "transit traffic" or traffic carried by intermediary carriers existed. As a result, the IUB refused to issue Qwest a declaratory order.

Instead, on June 23, 2000, the IUB opened Docket No. SPU–00–7 to address specific issues dealing with transit traffic and related issues. INS was allowed to intervene; thus, INS, Qwest, RIITA, and others became parties to the action before the Board. According to the IUB, this proceeding was to provide for a full and complete record since the proceeding would establish certain policies re-

garding transit traffic that could impact the entire telecommunications industry in Iowa.

**25.** Like RIITA, ITA is a trade association of Iowa LECs.

**26.** The Eighth Circuit characterized this action in the following manner:

The IUB, *in a directive short of an order*, strongly 'encouraged' the parties involved to resolve the dispute through negotiations conducted under 47 U.S.C. § 252(a) by reaching an interconnection agreement permitting reciprocal compensation, and if the negotiations proved unsuccessful, through an arbitrated agreement arranged by the Board pursuant to § 252(b).

*Rural Iowa Indep. Tel. Asss'n,* 362 F.3d at 1029 (emphasis added).

tion was available to resolve any issues the parties were unable to resolve by negotiation.

Some of the parties, including RIITA, appealed the proposed decision to the Board. The Board affirmed the proposed decision by order issued March 18, 2002 (hereinafter *"IUB Order Affirming Proposed Decision"*). One party, the Iowa Telecommunications Association ("ITA"), filed an application for rehearing, which the Board denied by order issued May 3, 2002 (hereinafter *"IUB Order Denying Rehearing"*). RIITA then sought judicial review of the Board's decision in the Iowa District Court for Polk County pursuant to Iowa Code § 17A.19 but never served the petition on the Board. RIITA voluntarily dismissed that action on June 21, 2002, and subsequently brought the present action in this Court.

Relevant to the present action, the Board made the following determinations in its rulings:

- under the FCC's orders, intraMTA traffic is classified as "local" and not subject to long distance "access" charges (*IUB Proposed Decision,* at 13, 21; *IUB Order Affirming Proposed Decision,* at 2);
- with regard to the traffic at issue, Qwest is not acting as an "IXC" providing "long distance" service to end users with whom it has a billing relationship but is providing an indirect connection for local traffic (*IUB Proposed Decision,* at 13); accordingly, Qwest "has no obligation to pay access or other termination fees" (*IUB Order Affirming Proposed Decision,* at 2);
- when Qwest refused in 1999 to continue paying access charges for traffic originated by third-party CMRS providers, it put INS and the terminating

ILECs "on notice that it no longer believed it was ordering" access services (*IUB Proposed Decision,* at 37–38);

- rates and other terms applicable to such arrangements, including proposals that transit and other traffic should be delivered over "separate" trunks, and "the means by which interMTA [i.e., long distance] calls should be distinguished [from] intraMTA [i.e., local] calls" are "good examples" of the kinds of issues that can best be addressed through the Act's negotiation and arbitration process (*IUB Proposed Decision,* at 30; *IUB Order Affirming Proposed Decision,* at 20);[27]
- the results of the negotiations (and arbitrations, if necessary) would relate back to April 1999 (*IUB Proposed Decision,* at 38);
- the independent LECs have not proven they are entitled to assert the "rural exemption," pursuant to 47 U.S.C. § 251(f)(1), from their section 251(c) duties, and the Board will consider section 251(f) factors "if and when a rural exemption claim" is "made and disputed" during the negotiation/arbitration process (*IUB Order Affirming Proposed Decision,* at 14).

As delineated above, RIITA attacks many of the IUB's determinations in the present action by contending they violate federal law as contained in the 1996 Act and the FCC decisions concerning that Act.

**ANALYSIS**

**A. Procedural Issues**

**1. Review of Administrative Agency Proceedings and Scope of Review**

 " 'The focal point for judicial review [of an administrative agency decision]

---

**27.** The Board also held that transiting carriers used by CMRS providers or ILECs to exchange traffic should be parties to the negotiations and Board arbitrations. *IUB Proposed Decision,* at 33.

should be the administrative record already in existence, not some new record made initially.'" *Florida Power & Light Co. v. Lorion*, 470 U.S. 729, 743, 105 S.Ct. 1598, 84 L.Ed.2d 643 (1985) (quoting *Camp v. Pitts*, 411 U.S. 138, 142, 93 S.Ct. 1241, 36 L.Ed.2d 106 (1973)); *see also Newton County Wildlife Assoc. v. Rogers*, 141 F.3d 803, 807 (8th Cir.1998) (following the rule that review of administrative determinations is confined to the administrative record). Thus, unless Congress has provided otherwise, judicial review of the determinations of an administrative agency proceeding are confined to the agency's record, and *de novo* proceedings may not be held. *United States v. Carlo Bianchi & Co.*, 373 U.S. 709, 715, 83 S.Ct. 1409, 10 L.Ed.2d 652 (1963).[28]

■ When there is, however, specific statutory authorization for an action in district court to enforce private rights, a trial *de novo* is appropriate, even in cases involving prior administrative agency determinations. *Chandler v. Roudebush*, 425 U.S. 840, 862–63, 96 S.Ct. 1949, 48 L.Ed.2d 416 (1976). This is because the authorization is based on a congressional determination that is not for the judiciary to disturb. *Id.* at 864, 96 S.Ct. 1949. In addition, a trial *de novo* may be warranted where the agency determination "is fraudulent or capricious or arbitrary or so grossly erroneous as necessarily to imply bad faith, or is not supported by substantial evidence." *Carlo Bianchi & Co.*, 373 U.S. at 714, 83 S.Ct. 1409. For such to be the case, "'there must be a *strong showing* of bad faith or improper behavior' before the reviewing court may permit discovery and evidentiary supplementation of the administrative record." *Newton County Wild-*

*life Assoc.*, 141 F.3d at 807 (emphasis added) (quoting *Citizens to Preserve Overton Park v. Volpe*, 401 U.S. 402, 420, 91 S.Ct. 814, 28 L.Ed.2d 136 (1971)); *see also Camp*, 411 U.S. at 142, 93 S.Ct. 1241.[29]

The rationale behind the fundamental principle of confining review of agency decisions to the administrative record is that the parties have had full opportunity to present their case to the administrative agency "so that the hearings ... provide substantial evidence to support the agency's decision." *Carlo Bianchi & Co.*, 373 U.S. at 717, 83 S.Ct. 1409. If a party were allowed to relitigate *de novo* issues presented in the agency proceedings, the structure and purpose of agency hearings would be frustrated because parties may decide "to withhold evidence at the administrative level and then introduce it in a judicial proceeding." *Id.* In addition, relitigation in federal court of issues resolved in administrative agency proceedings wastes judicial resources and may result in needless duplication of hearings and evidence. *Id.* Moreover, relitigation exacts a heavy burden in both time and costs to the involved parties and the court. *Id.* In addition, federal courts are not well-equipped to wade into the intricacies of regulatory matters entrusted to administrative agencies, *see Cronin v. United States Dep't of Agric.*, 919 F.2d 439, 444 (7th Cir.1990), particularly with the Communications Act which "gives the state commissions latitude to exercise their expertise in telecommunications and needs of the local market." *Mich. Bell Tel. Co. v. MCIMetro Access Transmission Servs., Inc.*, 323 F.3d 348, 352 (6th Cir.2003).

Qwest urges the Court to limit this action to judicial review of the agency action

---

**28.** Even in cases where the administrative record is lacking, the matter is not generally tried *de novo* by the court, but rather is remanded to the agency to allow it to develop adequate record. *Newton County Wildlife As-*

*soc.*, 141 F.3d at 807 (citing *Florida Power & Light Co.*, 470 U.S. at 744, 105 S.Ct. 1598).

**29.** This is not at issue in the present motion.

undertaken by the IUB. As a section 252(e)(6) case, Qwest contends the Court should decide it "on the basis of the record before the [agency] and the briefs of the parties," without a trial or discovery. *U.S. West Communications, Inc. v. Thoms,* 1999 WL 33456553 (S.D.Iowa 1999). While there was some initial resistance by RIITA on this issue, at the hearing RIITA withdrew its objections and acknowledged the Court's review is limited to the administrative record. The Court agrees and will therefore limit its review to the record before the IUB. The Board has already held extensive hearings on this matter and is particularly experienced in the telecommunications arena.

## 2. Issues on Motion

Pursuant to Rule 56 of the Federal Rules of Civil Procedure, Qwest moves for dismissal of all challenges in Plaintiff's Complaint to the lawfulness under the Communications Act of 1934, as amended by the Telecommunications Act of 1996, of decisions by the Iowa Utilities Board in its Docket No. SPU–00–7 regarding the intercarrier compensation for the termination of by ILECs of intraMTA calls placed by subscribers of third-party wireless carriers to the ILECs' subscribers. Qwest does, however, limit its motion to intercarrier compensation for the termination of wireless traffic by RIITA's members and does not seek summary judgment on any claim by RIITA regarding charges to end-users. Additionally, the issues currently raised by Qwest do not address outbound traffic, though the Board notes that its order does not distinguish or differentiate between inbound and outbound traffic in light of its interpretation of the definition of "local" traffic.

## B. Payment of Access Charges or Other Compensation

RIITA argues that the IUB erred in concluding the FCC has ruled "intraMTA" calls are "local", and that ILECs are required under the Act to enter into reciprocal compensation arrangements. RIITA contends in its Complaint that reciprocal compensation as set forth in negotiated or arbitrated interconnection agreements applies only where the originating CMRS provider and the terminating LEC are "directly" connected. Meanwhile, Qwest argues the IUB correctly held that a transit carrier is not responsible for payment to terminating carriers of access charges or other compensation for intraMTA calls placed by subscribers of third-party wireless carriers.

In its *Local Competition Order,* the FCC had to determine which telecommunications are subject to "reciprocal compensation" for "transport and termination" under section 251(b)(5). In so doing, the FCC distinguished between transport and termination of "local" calls and that for "long-distance" calls, the latter having been historically subject to access charges. *Local Competition Order,* at ¶ 1033. For purposes of regulation, a call is treated as "local" if it originated and terminates in the same local calling area; a call is treated as "long distance" if it terminates in a local calling area different than the one in which it originates.[30] *See Competitive Te-*

---

30. Long distance service is provided to the subscribers of "interexchange" (i.e., "long distance") carriers often referred to as "IXCs". For the origination and termination of long distance calls placed by their subscribers, IXCs use the LECs' local networks for which the IXCs pay "access charges". *See Southwestern Bell Tel. Co. v. FCC,* 153 F.3d 523, 542 n. 9 (8th Cir.1998). IXCs recover the costs they incur, including originating and terminating access charges payable to LECs, in the rates they charge their end-user customers. *Id.; see also Local Competition Order,* at ¶ 1034 (noting that "in the access charge regime, the long distance caller pays long-distance charges to the IX, and the IXC

*lecomms, Ass'n v. FCC*, 117 F.3d 1068, 1072 n. 3 (8th Cir.1997) (*"CompTel "*).

The FCC concluded that "section 251(b)(5) reciprocal compensation," and not "access charges," would apply "to traffic that originates and terminates within a local calling area, as defined" in a subsequent paragraph. *Local Competition Order*, at ¶ 1034. In defining the local service area for calls to or from a CMRS network for purposes of applying sections 251 and 252, the FCC determined that the MTA serves as the most appropriate definition for local service area for CMRS traffic. *Id.* at ¶ 1036. "Accordingly, traffic to or from a CMRS network that originates and terminates within the same MTA is subject to transport and termination rates under section 251(b)(5), rather than interstate and intrastate access charges." *Id.*[31] In contrast, "traffic originating or terminating outside of the applicable local area would be subject to interstate and intrastate access charges" payable by the long distance carriers using the LECs' networks to provide the "end to end" service that they "sell as [their] product to [their] customers." *Southwestern Bell*, 153 F.3d at 542 n. 9.[32]

Subsequent FCC decisions considered the rights and obligations of transiting carriers under the 1996 Act and the *Local Competition Order*. In discussing "types of local LEC–CMRS interconnection" in a notice of proposed rulemaking ("NPRM")

on intercarrier compensation, the FCC explained that "in rural settings, wireless carriers can elect to deliver CMRS-originated calls to a large ILEC for routing to the rural LEC carrier." Notice of Proposed Rulemaking, *Developing a Unified Intercarrier Compensation Regime*, 16 FCC Rcd. 9610, ¶ 91 (2001) (hereinafter *"Intercarrier Compensation NPRM "*).

In a separate case, the FCC provided the following in determining the application of its transport and termination rules to transiting:

> Currently, our rules in this area follow the cost causation principle of allocating the cost of delivering traffic to the carriers responsible for the traffic, and ultimately their customers. Thus, through reciprocal compensation payments, the cost of delivering LEC-originated traffic is borne by the persons responsible for those calls, the LEC's customers. As we stated in the Local Competition Order, "[t]he local caller pays charges to the originating carrier, and the originating carrier must compensate the terminating carrier for completing the call." ... In the case of third-party originated traffic, however, the only relationship between the LEC's customers and the call is the fact that the call traverses the LEC's network on its way to the terminating carrier. Where the LEC's customers do not generate the traffic at issue, those customers should not bear

---

must pay both LECs for originating and terminating access service").

**31.** These rulings were subsequently codified in FCC regulations at 47 C.F.R. § 51.701.

**32.** The Eighth Circuit has affirmed the FCC's determinations to require LECs to charge rates for the use of their networks to transport and terminate "local" calls that differ from the rates they are permitted to charge for the transport and termination of "long distance" calls. *CompTel*, 117 F.3d at 1073. This case

also affirmed that IXCs must pay access charges to LECs for terminating their calls. *Id.*

In reaching this decision, the court held the duty to interconnect is limited to an obligation to provide physical interconnection. *Id.* This means that ILECs do not have to provide transmission and routing services. *Id.; see also AT & T Corp. v. FCC*, 317 F.3d 227, 234–35 (D.C.Cir.2003) (relying on *CompTel* and concluding that the requirement for physical connection does not also require the exchange of traffic).

the cost of delivering that traffic from a CLEC's network to that of a CMRS carrier like Answer Indiana. Thus, the originating third party carrier's customers pay for the cost of delivering their calls to the LEC, while the terminating CMRS carrier's customers pay for the cost of transporting that traffic from the LEC's network to their network.

*Texcom Inc. v. Bell Atlantic Corp.,* 16 FCC Rcd. 21493, ¶ 6 (2001) (*"Texcom Order"*); *see also Texcom Inc. v. Bell Atlantic Corp.,* 17 FCC Rcd. 6275, ¶ 4 (2002) (*"Texcom Reconsideration Order"*).[33] On reconsideration of this decision, the FCC reiterated that a transiting carrier "may charge a terminating carrier for the portion of facilities used to deliver transiting traffic to the terminating carrier.... and [the terminating carrier] may seek reimbursement of these costs from originating carriers through reciprocal compensation." *Texcom Reconsideration Order,* at ¶ 4 (citing 47 U.S.C. § 251(b)(5), 47 C.F.R. § 51.702). The FCC also noted that "carriers are free to negotiate different arrangements for the costs associated with indirect interconnection." *Id.* (citing 47 U.S.C. § 252(a)(1)).

The FCC's Common Carrier Bureau ("the Bureau") also considered "the appropriate compensation mechanism for calls that originate on the network of a third-party LEC and terminate to an AT & T customer" during an arbitration of interconnection agreements done by the Bureau in lieu of the Virginia commission.[34] *Verizon Virginia Arbitration Order,* at ¶ 541. AT & T, the terminating carrier, proposed that Verizon, as the transiting carrier, treat all calls as Verizon's own and compensate AT & T accordingly. *Id.* The Bureau rejected this proposal, finding that "when a third-party LEC places a call that terminates to [an AT & T customer], AT & T must bill the third-party LEC directly" when traffic originated by third-party carriers "transits the network of an incumbent or other carrier, such as Verizon." *Id.* at ¶ 544 and n. 1807 (citing the *Texcom* decisions).

In another section 252(e)(5) arbitration, the Bureau held the transiting carrier was not responsible for paying compensation to the terminating carrier except as to calls for which the former failed to provide the latter call identification information passed by the originating carrier. *See Petition of Cavalier Telephone LLC Pursuant to ¶ 252(e)(5) of the Communications Act for Preemption of the Jurisdiction of the Virginia State Commission Regarding Interconnection Disputes with Verizon, Virginia, Inc., and for Arbitration,* 18 FCC Rcd. 25887 (FCC Wireline Competition Bureau 2003) (*"Cavalier"*). The Bureau did hold, however, that the transiting carrier was not required to alter its systems to develop information that was not transmitted to it by the originating carrier. *Id.* at ¶ 42.

**33.** In the *Texcom* case, at issue were intraMTA calls that originated on the networks of third-party carriers, transited the network of Defendant GTE North ("GTE"), and terminated on the network of Complainant Answer Indiana, a CMRS provider. *Texcom Order,* at ¶ 1. Answer Indiana's formal complaint to the FCC alleged that GTE's attempts to recover from it costs incurred to deliver the calls were unlawful. *Id.* at ¶ 3. The FCC denied Answer Indiana's complaint. *Id.* at ¶ 6.

**34.** The state commission for Virginia had declined to conduct the arbitration. *In re Petition of Worldcom, Inc. Pursuant to Section 252(e)(5) of the Communications Act for Preemption of Jurisdiction of the Virginia State Commission Regarding Interconnection Disputes with Verizon Virginia Inc., and for Expedited Arbitration,* 17 FCC Rcd. 27039, ¶ 1 (2002) (hereinafter *"Verizon Virginia Arbitration Order"*). In that circumstance, the 1996 Act requires the FCC to conduct the arbitration. *See* 47 U.S.C. § 252(e)(5).

Qwest contends that the IUB correctly interpreted the Act and the FCC decisions applying the Act and counters that RII-TA's proposed interpretation would result in massive increases in costs incurred by CMRS providers and the resulting increased cost to consumers. Specifically, Qwest contends that if RIITA's argument were correct, CMRS providers would either need to build up their network infrastructure in order to interconnect directly with many terminating ILECs[35] or interconnect indirectly with and pay to the terminating LEC's non-cost based access charges averaging about 9.2 cents per minute ("cpm"). In contrast, Qwest asserts cost-based reciprocal compensation would average approximately 1 cpm. Qwest maintains that the resulting costs, many of which would be passed to consumers, is the very result the FCC sought to avoid in the *Local Competition Order.*

The FCC's *Local Competition Order* provides that "traffic to and from a CMRS network that originates and terminates with the same MTA" is "local" traffic, and not long distance traffic subject to access charges. Qwest argues that this is so regardless of whether one or more intermediate or transiting carriers provide a portion of the transport of the call from the network of the CMRS provider to the network of the terminating LEC. Pursuant to this argument, under the FCC's decision, the relevant facts are the geographic locations of the end-user customers placing and receiving the call, not the method of interconnection chosen by the originating and terminating carriers.

In its decision, the Board explained that this determination means Qwest is not acting as an IXC providing long distance service to end users when the calling and called parties are located in the same MTA and the caller is served by a third-party CMRS provider. *IUB Proposed Decision,* at 13. Instead, Qwest is "providing an indirect connection for local traffic." *Id.* Based on this determination, the IUB held that Qwest "has no obligation to pay access or other termination fees." *Order Affirming Proposed Decision,* at 2.

■ Qwest asserts that all federal courts to consider this issue have ruled, like the Board, that indirect connection through a transiting carrier does not convert intraMTA "local" calls into "long distance" calls for which the transiting or any other carrier must pay "access" charges to the terminating carrier.[36] For example, in *3 Rivers Telephone Cooperative, Inc. v. U.S. West Communications, Inc.,* the court reasoned that the FCC's *Local Competition Order* "makes no distinction between such traffic [i.e., traffic delivered over a direct connection] and traffic that flows between a CMRS provider and LEC in the same MTA that also happens to transit another carrier's facilities prior to termination." *3 Rivers Tel. Coop., Inc. v. U.S. West Communications, Inc.,* 2003 U.S. Dist. LEXIS 24871, at *67 (D.Mt. 2003), *accord. Union Tel. Co. v. Qwest*

---

**35.** Including more than one hundred terminating ILECs in Iowa alone.

**36.** Qwest notes that RIITA has relied on decisions of the state commission and state courts of Missouri which approve the use of tariffs in lieu of interconnection agreements to establish compensation for the termination of intraMTA wireless traffic. *See In the Matter of Mark Twain Rural Telephone Company's Proposed Tariff to Introduce Its Wireless Termination Service,* 2001 Mo PSC LEXIS 760,

Case No. TT–2201–139, at *20 (Mo. PSC 2001) (citing *In the Matter of Alma Telephone Co.,* Case No. TT–999–428 (Mo. PSC 2000)). Qwest asserts, however, that these decisions *reject* the argument that use of a transit carrier converts what would otherwise be a local call into a long distance call, thereby allowing the terminating carrier to seek access charges or other compensation from the transiting carrier as opposed to the originating carrier, *see id.,* and thus do not contradict the decisions cited by Qwest.

*Corp.*, slip op., No. 02–CV–209B, at 26. 34 (D.Wyo. May 11, 2004); *see also Atlas Tel. Co. v. Corp. Comm'n of Okla.*, 309 F.Supp.2d 1299, 1310 (W.D.Okla.2004) (finding, consistent with the determination of the Oklahoma Commission decision being reviewed, that the FCC's classification of "mobile intraMTA traffic" as "local" as opposed to "toll" (i.e., interexchange or long distance) traffic applies "without regard to whether those calls are delivered via an intermediate carrier").[37] Accordingly, the *3 Rivers* court held that "Qwest is not liable to plaintiffs for terminating access charges on CMRS (wireless) traffic that both originates and terminates in the same MTA." [38] *Id.* at *68–69.

Qwest further asserts that the FCC's own decisions foreclose any doubt that indirect interconnection does not convert intraMTA calls into "long distance" calls or otherwise justify the imposition of a compensation obligation for such calls on a transiting carrier. As Qwest points out, in Paragraph 1039 of the *Local Competition Order* the FCC acknowledges the existence of indirect interconnection between originating and termination carriers through "facilities provided by alternative carriers," but nowhere held such an arrangement converted a "local" call into a "long distance" call or allowed other carriers to impose a compensation obligation on the transiting carrier. *See Local Competition Order*, at ¶ 1039. Additionally, in its *Intercarrier Compensation NPRM*, the FCC confirmed that use of a transit carri-er for intraMTA calls is a form of "local" connection. *Intercarrier Compensation NPRM*, at ¶ 91.

In addition, Qwest argues that the FCC held specifically that the "cost causation principles" underlying its intercarrier compensation rules "allocate" the cost of delivering traffic to the carriers responsible for the traffic and, ultimately, their customers. *Texcom Order*, at ¶ 6; *Texcom Reconsideration Order*, at ¶ 4 (citing 47 U.S.C. § 251(b)(5), and 47 C.F.R. § 51.702). Thus, where a transiting carrier is involved, the originating third-party carrier pays for the cost of delivering their calls to the transiting carrier, while the terminating carrier pays for the cost of transporting that traffic from the transiting carrier's network to its network. *Texcom Order*, at ¶ 6; *Texcom Reconsideration Order*, at ¶ 4. The terminating carrier may then "seek reimbursement of these costs from originating carriers through reciprocal compensation." *Texcom Reconsideration Order*, at ¶ 4 (citing 47 U.S.C. § 251(b)(5), and 47 C.F.R. § 51.702). Thus, transiting carriers bear no responsibility for compensating other carriers, for they lack relationships with either the calling or called parties.

Finally, Qwest contends that the FCC's Common Carrier Bureau, acting on behalf of the FCC in place of a state commission, has stated that federal law does not require a transiting carrier over its objection to compensate another carrier for its

---

**37.** In a supplemental filing, Qwest draws the Court's attention to a recent decision from the U.S. District Court for the District of Nebraska where the court held, like the courts in *3 Rivers* and *Union*, that under the FCC's decisions, originating carriers must pay compensation to terminating carriers under the reciprocal compensation provisions of the 1996 Act "whether or not the call was delivered via an intermediate carrier." *WWC License, L.L.C. v. Boyle*, slip op., Docket No. 4:03CV3393, at *6 (D.Neb. Jan. 20, 2005).

**38.** The *3 Rivers* court also rejected the argument that paragraph 1043 of the *Local Competition Order* "carved out an exception that preserves the access charge system for wireless calls that were subject to access charges prior to the 1996 Act." *3 Rivers Tel. Coop., Inc.*, 2003 U.S. Dist. LEXIS 24871 at *67; *see also IUB Proposed Decision*, at 12–13 (rejecting same argument).

transport and termination of calls originated by third-party carriers under the theory that the calls are the transiting carrier's "own traffic," *see Verizon Virginia Arbitration Order*, at ¶ 541; *see also id.* at ¶¶ 114, 119, and that there is no evidence in the Board's record that Qwest refused to provide to terminating LECs information received by Qwest from the originating CMRS providers. *See Cavalier*, at ¶ 42. Based on these decisions, Qwest argues that it could not be clearer that transiting carriers have no compensation obligations with respect to the transport and termination of intraMTA wireless or other local calls originated by end-user customers of third-party carriers under the Act.[39]

RIITA asserts Qwest is being melodramatic in stating every court or agency has rejected RIITA's argument. To the contrary, RIITA argues that no court or agency other than the IUB has found that transiting carriers delivering traffic without the consent of the terminating party are not responsible for payment. RIITA urges the Court to disregard Qwest's citations to any arbitration cases. RIITA contends the IUB decision inhibits bona fide requests and negotiations,[40] thereby rendering Qwest's reliance on arbitration cases meaningless.

RIITA asserts that Qwest focuses its argument on paragraph 1034 of the *Local Competition Order*, yet fails to discuss that the traffic at issue falls between the two examples used in that paragraph. RIITA points out the FCC also stated that "[a]ccess charges were developed to address a situation in which three carriers—typically, the originating LEC, the IXC, and the terminating LEC—collaborate to complete a long-distance call.... By contrast, reciprocal compensation for transport and termination of calls is intended for a situation in which two carriers collaborate to complete a local call." *Local Competition Order*, at ¶ 1034. RIITA maintains the *Local Competition Order* does not answer the key question in this case: how should three carriers, an originating wireless carrier, a carrier transporting calls across exchange boundaries, and a terminating LEC, handle and compensate each other for telephone traffic? RIITA asserts that even the FCC is unsure how to handle this situation. *See Intercarrier Compensation NPRM*, at ¶ 91 n. 148 ("Increasingly, the large ILEC is unwilling to bill for the rural carrier, so rural LECs have begun to insist that the CMRS carrier deliver calls directly to the rural LEC's switch.").[41]

---

**39.** RIITA's Complaint also asserts the Board decision "is based on the incorrect legal conclusion that the independents have a duty under the Act to carry and terminate calls in the manner chosen unilaterally by Qwest and are not allowed to block" transit traffic. RIITA does not deny, however, that ILEC members of RIITA are obligated to interconnect with other telecommunications carriers, including CMRS providers, and may not block calls placed to the ILECs subscribers by subscribers of other carriers. *See* 47 U.S.C. §§ 251(a), 251(b)(5), 251(c)(2). Further, Qwest points out that the Board found the manner of interconnection was chosen by the CMRS providers, not Qwest, similar to the decision of RIITA's members to interconnect with other carriers through INS. *IUB Proposed Decision*, at 30, 34 n. 9. In any event,

the Board did not hold that Qwest or any other carrier could unilaterally determine the manner of interconnection, but stated that this issue should be resolved through the negotiation/arbitration process. *See IUB Order Affirming Proposed Decision*, at 20.

**40.** RIITA does, however, recognize that negotiation and arbitration would allow the wireline companies to propose alternative routing and terms for delivery that are unique to the exchange or to Iowa.

**41.** RIITA asserts that in the present case, rural LECs have insisted that wireless carriers deliver calls directly to the rural LEC, but the IUB's decision takes that option away by allowing traffic to flow without anyone paying for termination.

RIITA contends the FCC decisions regarding transiting subsequent to the *Local Competition Order* cited by Qwest are inapposite as they are all either paging cases or arbitration review cases. RIITA contends these cases do not contain holdings related to inbound traffic where the wireless carrier is originating traffic bound for a wireline carrier (the paging cases) [42] or concern arbitration following failed negotiations which has not occurred here because the wireless carriers have not served BFRs (arbitration review cases).

RIITA also urges the Court to reject Qwest's reliance on the *3 Rivers* decision as being interlocutory and unpublished,[43] though RIITA subsequently contends the decision supports RIITA's claims. According to RIITA, the *3 Rivers* court found rural wireline tariffs make Qwest "liable for paying Plaintiffs terminating carrier access charges for the provision of access service regardless of the identity of the originating carrier." *3 Rivers Tel. Coop., Inc.*, 2003 U.S. Dist. LEXIS 24871. The *3 Rivers* court then determined this argument was preempted by federal law. *Id.*

RIITA contends that federal preemption is a different argument than the one made by Qwest, and one that has been rejected by other courts. *See Mich. Bell Tel. Co.*, 323 F.3d at 358–59 ("Though an approved interconnection agreement means the general duties of 251(b) and (c) no longer apply, the Act is silent with respect to preexisting state duties."). Indeed, "in the absence of persuasive evidence of preemptive intent by the FCC," judicial restraint weighs against preemption. *Qwest v. Scott*, 380 F.3d 367, 374 (8th Cir.2004). RIITA contends that nothing in the Act preempts state tariffs such that they can be overridden by the negotiation/arbitration procedures in the Act.[44]

---

**42.** RIITA does assert that two key holdings come from the paging cases, which dealt solely with outbound traffic. First, the originating wireline carrier can charge its own customers for the cost of transporting the call to a wireless carrier even if the call is considered local, and these charges can be in the form of routing the calls to an IXC. Second, the FCC noted that FCC regulations "require that, to the extent that local telecommunications traffic originates in the network facilities of one carrier and terminates on the facilities of another, compensation shall be paid to the terminating carrier." *In re TSR Wireless, L.L.C.*, 15 FCC Rcd. at 11178 (2000); *see also Mountain Communications, Inc. v. FCC*, 355 F.3d 644 (D.C.Cir.2004).

**43.** Qwest asserts that if this argument is accepted, few district court decisions would have any value as authority in other cases.

**44.** Qwest points out that RIITA identifies no tariff in effect that even purports to authorize its members to collect long distance access charges from Qwest or any other carrier for the termination of intraMTA or other local calls. The only tariff considered by the IUB was one proposed by ITA, *see IUB Order Affirming Proposed Decision*, at 17 (noting "the only potentially relevant filed tariff is an access tariff, which does not apply to local traffic"), which the Board rejected because, *inter alia*, it sought to impose access charges for the termination of intraMTA (i.e., local) traffic in violation of 47 U.S.C. §§ 252(1)(5), 252(d)(2)(A)(ii), and the *Local Competition Order*. *IUB Proposed Decision*, at 21; *IUB Order Affirming Proposed Decision*, at 10.

Qwest contends that even if the rates included in ITA's proposed tariff were cost-based, the Board properly rejected the tariff on the ground it sought to bypass the Act's exclusive negotiation/arbitration process. *See Verizon North, Inc. v. Strand*, 309 F.3d 935, 939 (finding tariff purporting to dictate the terms for transport and termination of local traffic evades the exclusive process required by the 1996 Act); *see also Iowa Utils. Bd. v. FCC*, 120 F.3d at 801 (noting the 1996 Act was "design[ed] to promote negotiated binding agreements"). The ITA tariff would have dispensed with interconnection agreements entirely, *see* ITA Tariff No. 2, dated October 31, 2001, original page 1, section 1.1.A (proposing tariff that states without exception or qualification "the arrangements by which the Company performs its duties under section 251(b)(5) of Title 47 of the U.S.Code, regard-

Finally, RIITA asserts that the Eighth Circuit has found Qwest does not have an obligation to deliver this traffic under these circumstances. *Iowa Network Servs., Inc. v. Qwest Corp.*, 363 F.3d 683, 694 n. 3 (8th Cir.2004) ("We respectfully believe that the district court misstated the law in stating that as an ILEC, Qwest was obligated to carry the CMRS traffic if requested to do so."). RIITA draws from this finding the conclusion that if Qwest *chooses* to deliver this traffic in the absence of an agreement between the originating and terminating carriers, then Qwest must pay for the termination of the traffic. In short, Qwest becomes the *cost-causer* by volunteering to deliver the traffic.

Qwest replies that, contrary to RIITA's suggestion, there is no indication the terminating carriers in the *3 Rivers, Union,* and *Atlas* cases had entered into interconnection agreements with the originating wireless carriers or otherwise consented to the use of a transit carrier by wireless carriers. Qwest further disputes RIITA's suggestion that the cases relied upon by Qwest are limited to paging carriers or that these decisions may be applied solely in arbitrations.

Qwest next reiterates that the FCC decisions regarding transit traffic uniformly hold transiting carriers are not required to pay compensation to other carriers for handling intraMTA calls placed by customers of other carriers. *See Intercarrier*

*Compensation NPRM,* at ¶ 91 n. 148;[45] *Texcom Order,* 16 FCC Rcd. 21493; *Texcom Reconsideration Order,* 17 FCC Rcd. 6275; *Verizon Virginia Arbitration Order,* at ¶¶ 114, 119; *Cavalier,* 18 FCC Rcd. 25887. Finally, Qwest disputes RIITA's characterization of Qwest as the cost-causer by asserting it did not collude with anyone to deny compensation to the terminating LECs. In any event, Qwest asserts FCC decisions establish the cost-causer is the carrier that serves the caller, *not* the carrier that delivers the call to the terminating carrier, regardless of whether the transit service is provided voluntarily or under legal compulsion. *See Verizon Virginia Arbitration Order,* at ¶ 117 (finding transit carrier has no duty to compensate or bill for terminating carriers even where transiting is provided voluntarily).

The IUB also responds to RIITA's contention that the Board's decision is denying RIITA's members from receiving compensation for terminating traffic. According to the Board, it has consistently taken the position that the rural LECs should be paid for the services they render. The Board encouraged parties to negotiate their own resolution of this issue, but also provided that if negotiations were unsuccessful and the conditions warranted, "the Board will set a rate applicable to exchange of the traffic, in order to fairly compensate the carriers for use of their respective networks." *Order Deny-*

ing local telecommunications traffic"); whereas in the case cited by RIITA, the tariff merely supplemented the rights granted to the plaintiff under the parties' interconnection agreement. *See Mich. Bell Tel. Co.,* 323 F.3d at 357 (allowing carrier to place orders with ILEC by facsimile as provided in tariff, notwithstanding the absence of provisions permitting this in the parties' interconnection agreements); *cf. Verizon North, Inc. v. Strand,* 367 F.3d at 583, 584 (finding that a "unilaterally filed tariff" that "effectively eliminates any incentive [on the part of the

issuing carrier] to engage in private negotiation" is "inconsistent with the negotiation and arbitration provisions of § 252" and thus is "preempted by [the 1996] Act").

**45.** Qwest asserts that the fact that the FCC's proceeding remains open does not mean the FCC is uncertain how to handle this situation under current regulations as RIITA claims. The FCC's proceeding is concerned with rules that will govern future transactions, not the resolution of disputes under the regulations in effect today.

*ing Application for Rehearing*, at 7. Thus, the Board argues any claim by RIITA that the Board is denying them compensation to which they are entitled is simply incorrect.

During the pendency of this action, the FCC filed two items that affect the Court's determinations of these issues. First, the FCC released its Declaratory Ruling Report and Order, *Developing a Unified Intercarrier Compensation Regime, T–Mobile Petition for Declaratory Ruling Regarding Incumbent LEC Wireless Termination Tariffs*, CC Docket No. 01–92, FCC 05–42 (FCC Feb. 24, 2005) ("*T–Mobile Wireless Termination Order*"). The T–Mobile petitioners had sought a declaratory ruling that "wireless termination tariffs are not a proper mechanism for establishing reciprocal compensation arrangements for the transport and termination of traffic." *T–Mobile Wireless Termination Order*, at ¶ 1.[46]

In the *T–Mobile Wireless Termination Order*, the FCC ruled that under existing FCC rules it was not unlawful "per se" for LECs terminating wireless-originated calls to collect charges from wireless carriers through the use of termination tariffs. *T–Mobile Wireless Termination Order*, at ¶ 9. The FCC found that nothing in its rules prevented the use of tariffs in a manner that did not conflict with an agreement negotiated or arbitrated pursuant to Section 252 of the Communications Act. *Id.* at ¶ 13. Qwest argues the *T–Mobile Wireless Compensation Order* confirms that the FCC's pre-Act decisions intended that CMRS interconnection issues would be resolved in "negotiated agreements between the parties," and further "express[ed] an expectation that tariffs would be filed only after carriers have negotiated agreements." *Id.* at ¶ 11. Indeed, the *Order* reaffirms and states clearly the FCC's "clear preference for contractual arrangements for non-access" traffic. *Id.* at ¶ 14.

The *T–Mobile Wireless Compensation Order* also reaffirms the FCC definition that "traffic to or from a CMRS network that originates and terminates within the same Major Trading Area (MTA) is subject to reciprocal compensation obligations under section 251(b)(5), rather than interstate or intrastate access charges." *Id.* at ¶ 3. Further, the *Order* restates the definition of "local" traffic "subject to reciprocal compensation as traffic 'that, at the beginning of the call, originates or terminates within the same Major Trading Area.'" *Id.* (citing 47 C.F.R. § 51.701(b)(2)).

The *T–Mobile Wireless Compensation Order* then acknowledges that section 251(b)(5) and the FCC's reciprocal compensation rules "do not explicitly address the type of arrangement necessary to trigger the payment of reciprocal compensation or the applicable compensation regime, if any, when carriers exchange traffic without making prior arrangements with each other." *Id.* at ¶ 4 (citing 47 U.S.C. § 251(b)(5), and 47 C.F.R. § 51.703(a)). The FCC goes on to recognize disputes arising out of the exact circumstances present in this case, i.e., an indirect interconnection between CMRS providers and smaller LECs via a Bell Operating Company ("BOC") tandem even if there is no interconnection agreement or other compensation arrangement between the parties. *Id.* at ¶ 5. The FCC acknowledges that this practice has led to

---

46. The T–Mobile petitioners asserted that "such tariffs are unlawful because they: (1) bypass negotiation and arbitration procedures in sections 251 and 252 of the Act; (2) do not provide for reciprocal compensation to commercial mobile radio (CMRS) providers; and (3) contain rates that do not comport with the Total Element Long–Run Incremental Cost (TELRIC) pricing methodology as required by the Commission's rules." *T–Mobile Wireless Termination Order*, at ¶ 1.

"numerous disputes between LECs and CMRS providers as to the applicable intercarrier compensation regime." *Id.* at ¶ 6. The *T–Mobile Wireless Compensation Order* then goes on to discuss the use of tariffs, finding such previously-filed tariffs valid and prohibiting their use on a going forward basis. *Id.* at ¶¶ 7–9.[47]

On March 3, 2005, the FCC released its *Further Notice of Proposed Rulemaking in the Matter of Developing a Unified Intercarrier Compensation Regime,* CC Docket No. 01–92, FCC 05–33 (Mar. 3, 2005) (hereinafter *"Further NPRM "*). In this notice of proposed rulemaking, the FCC discusses intermediary carriers and the reciprocal compensation rules. While this notice is merely a proposal to adopt a rule of prospective applicability rather than a binding order, the FCC's discussion in the *Further NPRM* is still pertinent to the IUB decisions at issue here, and this gradually evolving area of telecommunications law.[48]

In the *Further NPRM,* the FCC observes that it has not adopted rules governing the charges of intermediary, i.e., transiting carriers. The FCC states the following:

> The reciprocal compensation provisions of the Act address the exchange of traffic between an originating carrier and a terminating carrier, but the Commis-

sion's reciprocal compensation rules do not directly address the intercarrier compensation to be paid to the transit service provider.

*Further NPRM,* at ¶ 120. The FCC states further,

> If rules regarding transit service are warranted, we seek comment on the scope of such regulation. Specifically, we seek comment on whether transit service obligations under the Act should extend solely to the incumbent LECs or to all transit service providers, including competitive LECs.

*Further NPRM,* at ¶ 130. And additionally,

> [W]e seek further comment on the appropriate pricing methodology, including the possibility of requiring that transit service be offered at the same rates, terms, and conditions as the incumbent LEC offers for equivalent exchange access services (e.g., tandem switching and tandem switched transport) and how this option would be affected by our proposals to alter the current switched access regime.

*Further NPRM,* at ¶ 132.

The FCC also makes the following statement, demonstrating the unresolved legal backdrop at the genesis of the present conflict:

---

47. The FCC prospectively amends Rule 20.11 to provide that "[l]ocal exchange carriers may not impose compensation obligations for traffic not subject to access charges upon commercial mobile radio service providers pursuant to tariffs." New 47 C.F.R. § 20.11(e) (taking effect 30 days after publication in the Federal Register). As a new administrative rule, Rule 20.11(e) has no retrospective effect. *T–Mobile Wireless Termination Order,* at ¶ 1. The Court finds these changes are directed to the process rather than changing the underlying substantive law.

48. The rulemaking proceeding is on a slow track that commenced in 2001 and has just

now reached the stage of publishing a menu of alternative proposals for new rules (but not yet specific rule text) and seeking comment on them from the industry and other affected parties. Given the lengthy comment period (running 90 days following publication in the Federal Register), the time required to analyze the voluminous comments likely to be received, and the overall slow pace of this rulemaking proceeding, the Court does not anticipate that a decision will be issued until sometime in 2006, at the earliest. Even then, the results of that decision would only affect calls carried after the new rules, if any, are adopted and go into effect.

We also note that carriers have disagreed regarding the meaning of the existing intraMTA rule. Many rural LECs argue that intraMTA traffic between a rural LEC and a CMRS provider must be routed through an IXC and therefore is subject to access charges, rather than reciprocal compensation. CMRS providers, however, argue that all CMRS traffic that originates and terminates within a single MTA is subject to reciprocal compensation. In the event that we retain the rule and interpret its scope in the more limited fashion advocated by the rural LECs, should the rule be changed so that all intraMTA traffic to or from a CMRS provider is subject to reciprocal compensation? *See Further NPRM,* at ¶ 137(footnotes omitted).

Qwest points out that the *Further NPRM* states only that the FCC has "not adopted rules" governing the charges of transiting carriers, and "not resolved" other issues. Qwest asserts that what RIITA misses is that the Iowa Utilities Board *has* resolved these issues in Iowa, consistent with the Board's role under the 1996 Act and the FCC's pre-Act decisions. Qwest contends that the Board's decisions are thus substantive law that must be applied to the merits of the parties' dispute, unless RIITA is able to show the Board's decision *violates* federal law.[49]

Qwest reiterates that FCC decisions have consistently held that disputes within a state regarding the rates, terms, and conditions applicable to LEC–CMRS interconnection (including the transport and termination of intrastate wireless calls) are to be resolved by the state commission, except to the extent the state's decisions conflict with FCC regulations. *See Efficient Use of Spectrum,* at ¶¶ 54–56

(holding intercarrier compensation arrangements for wireless traffic are to be established in interconnection agreements between the parties); *Equal Access NPRM,* at ¶ 108 (finding wireless interconnection arrangements are "largely a matter of state, not federal concern"); *Section 332 Implementation Order,* at ¶ 231 (holding the rates for the intrastate component of wireless interconnection agreements is entirely a matter of state concern).

Qwest further underscores its argument by pointing out that in the 1996 Act, Congress expressly authorized state commissions to prescribe regulations to fulfill the requirements of that section of the Act encompassing Sections 251 through 261, *see* 47 U.S.C. § 261(b), and the FCC has held LEC–CMRS interconnection issues are to be addressed under sections 251 and 252. *Local Competition Order,* at ¶¶ 1023, 1025. Thereafter, the FCC held that where it has not clearly resolved a section 251 issue, the state commission is authorized to resolve it subject to federal court review, *Qwest Application,* 17 FCC Rcd. 26303, ¶ 325, and the Eighth Circuit has confirmed federal law does not preempt state regulation absent an express declaration to that effect by the FCC. *See Qwest v. Scott,* 380 F.3d 367 (8th Cir.2004). Qwest argues that, *a fortiori,* where the FCC has expressly declined to preempt state regulation of intrastate communications, state commissions retain jurisdiction.

Qwest emphatically argues that, ultimately, RIITA's failure to show the Board's resolution of the parties' dispute violates federal law is fatal to its Complaint. Qwest points out that the FCC prefers negotiated agreements, as recently reaffirmed in its *T–Mobile Wireless Ter-*

---

49. Qwest notes that it is not arguing here for application of the principle of either claim or issue preclusion; rather, the Court should consider and reject in the merits any claim by RIITA that the Board's decision violates federal law.

*mination Order. See T–Mobile Wireless Termination Order,* at ¶ 14. Qwest also argues that equally important is the acknowledgment in the *Further NPRM* that compensation for the termination of intraMTA is a matter for the originating and terminating carriers, not the transiting carrier. *Further NPRM,* at ¶ 133. Indeed, in a prior NPRM, the FCC emphasized that its "[e]xisting access charge rules and the majority of existing reciprocal compensation agreements require the calling party's carrier, whether LEC, IXC or CMRS, to compensate the called party's carrier for terminating the call." *Intercarrier Compensation NPRM,* at ¶ 9.

These latest FCC decisions and proposed rulemaking demonstrate the transitional state of telecommunications law. Furthermore, it demonstrates that the copious disputes are very much a result of the current state of the law, where the FCC has not kept pace with the advancement in technology and the needs of those in the telecommunications industry. This indeterminate framework has, in large part, resulted in the confusion and contention between the parties to this action.

Under the blanket of this confusion and contention, the parties participated before the IUB in proceedings geared toward resolving the disputed issues. The Court notes this was the proper procedure. The Court further finds the Board did not violate federal law in rendering the decisions at issue here. In light of the FCC's *T–Mobile Wireless Compensation Order,* RIITA conceded during oral argument that there is really no longer any dispute of what constitutes "local" traffic in these circumstances. The IUB's definition of "local" traffic is consistent with that of the FCC, and application of that definition to the traffic at issue in this case is entirely appropriate. The Court notes the FCC's discussion in the *T–Mobile Wireless Compensation Order* was merely a clarification of existing standards and not a change in the law. Thus, the IUB decision related to the type of traffic was in accordance with federal law.

As a result, the IUB's subsequent determinations related to reciprocal compensation and the obligations of the parties were also in accordance with federal law. While several of these issues have not been expressly determined by the FCC, and some are even postured for interpretation as demonstrated in the *Intercarrier Compensation NPRM* and the *Further NPRM,* such determinations by the state commission are entirely appropriate in the absence of such express conclusions. Thus, the Court concludes the IUB was within its authority to find Qwest was not acting as an IXC with respect to the traffic at issue and was not obligated to pay access charges, and that the terminating LECs needed to seek compensation from the originating carriers under a reciprocal compensation arrangement. These determinations are consistent with the 1996 Act and the FCC's implementing and explanatory decisions.

The IUB also did not offend federal law in strongly suggesting the parties (including the transiting carriers) negotiate reciprocal compensation arrangements, and if those negotiations failed, seek arbitration before the Board. As noted most recently in the *T–Mobile Wireless Compensation Order,* the FCC strongly encourages negotiation/arbitrations in accordance with its "strong preference for contractual arrangements." *T–Mobile Wireless Compensation Order,* at ¶ 9. This preference springs directly from the purposes of the 1996 Act, and the Board's decision effectively promotes the aims of that Act. Accordingly, the Court finds the decisions of the IUB do not violate federal law and therefore must be upheld. The Court further finds the actions undertaken by the

Board entirely appropriate and consistent with the aims of the 1996 Act and the FCC's implementing decisions.

## C. Bona Fide Requests

■ With the conclusion that the Board correctly defined the traffic at issue and ordered negotiation/arbitration, RIITA contends that this process is unavailable to it absent a bona fide request which therefore violates federal law. Qwest, on the other hand, asserts RIITA is incorrect in complaining that the IUB erred by concluding ILECs must interconnect with CMRS providers in the absence of a bona fide request. In addition, Qwest urges the Court to reject RIITA's Complaint to the extent RIITA challenges the Board's decision to reject the proposed ITA tariff purporting to impose access charges on CMRS providers in the absence of an interconnection agreement or that CMRS providers had made no BFRs.

The Board held that "the CMRS carriers must make a bona fide request of each" terminating LEC to initiate negotiations. *IUB Proposed Decision*, at 33. Qwest contends this express declaration renders RIITA's assertion of Board error baffling and wrong. Qwest contends that even if, assuming *arguendo*, the sending of calls by the CMRS providers to the terminating LECs did not constitute a BFR, the record before the Board contains substantial evidence that CMRS providers had contacted terminating LECs to request negotiations.[50] In any event, Qwest contends that no CMRS provider has denied it is obligated to compensate the ILECs for terminating calls placed by their subscribers to the ILECs' subscribers.

Qwest next asserts that the Board expressly provided a remedy for the terminating ILECs that would apply to all of the calls at issue, including calls prior to negotiations for or the adoption of an interconnection agreement. Specifically, the IUB ruled that the results of the section 252 negotiation/arbitration process would apply retroactively, thereby assuring the ILECs would be compensated by the CMRS providers for terminating all the calls at issue. Qwest maintains this ruling is entirely consistent with FCC decisions subsequent to the *Local Competition Order* applying retroactive "true-ups" for transactions that occur in the absence of rates approved by the state commission under the 1996 Act. *See. e.g., Application of SBC Corp. Pursuant to Section 271 of the Telecommunications Act of 1996 to Provide In–Region InterLATA Service in Texas,* 15 FCC Rcd. 18354, at ¶ 236 (FCC 2000)("*FCC Texas 271 Order*").[51] Moreover, the FCC has specifically authorized the use of interim rates for transport and termination pending the formation and approval of an interconnection agreement. *Local Competition Order,* at ¶ 1067. Accordingly, Qwest contends that the absence of an interconnection agreement does not justify imposition of access charges pursuant to a tariff or otherwise.

Finally, Qwest argues that even if the application of tariffed access charges for intraMTA calls is permissible in the absence of an interconnection agreement of BFR by the CMRS provider,[52] the Court should affirm the Board's holding that the transit carrier is not responsible for payment to the terminating LEC of access

---

**50.** The record before the Board includes testimony from a witness for CMRS provider Sprint that his company began negotiations with terminating LECs during the summer of 2000, and with a witness for CMRS provider Verizon Wireless that his company had begun to request negotiations.

**51.** The FCC has approved such true-ups even where the interim rate was effectively zero. *FCC Texas 271 Order,* at ¶ 237.

**52.** *See* discussion *supra,* at footnote 44.

charges or other compensation for calls placed by subscribers of third-party carriers. As detailed above, Qwest maintains this holding is entirely consistent with federal law. Further, none of the transiting cases decided by the FCC or the Bureau deem it appropriate to impose liability on a transiting carrier based upon the absence of an interconnection agreement between the originating and terminating carriers or a request for negotiations by one of those parties. To the contrary, the Bureau found that requiring the transit carrier to compensate the terminating LECs or "serve as a billing intermediary" for transit traffic "contravenes [the terminating LECs'] duty to establish reciprocal compensation arrangements with other carriers." *Verizon Virginia Arbitration Order*, at ¶¶ 114, 119.

RIITA contends Qwest is in error in asserting "the record contains substantial evidence that CMRS providers had contacted terminating LECs to request negotiations." RIITA avers this is not factually true and that the IUB did not make that finding. Instead, the Board stated the wireless carriers would need to make BFRs to instigate negotiations.[53] *IUB Proposed Decision*, at 33. RIITA interprets this to mean that the CMRS carriers would need to make those BFRs in the future. RIITA further contends the rec-

ord actually demonstrates few BFRs have been made,[54] and that if any BFRs had been filed since the Board issued its orders Qwest could have presented evidence of that via affidavit.[55] RIITA asserts that the absence of this evidence is proof there have been no BFRs issued by wireless carriers to terminating LECs since the IUB's decision.

RIITA asserts there is no reason for the wireless carriers to make a BFR. RIITA contends the Board's decision effectively allows wireless carriers to transit the traffic over Qwest's network without paying the terminating carriers, thereby providing little motivation for wireless carriers to make BFRs. RIITA argues if the wireless carriers send BFRs, they would then have to negotiate agreements and actually have to pay for the traffic, whereas under the IUB decision, the wireless carriers pass off the traffic without paying.

RIITA also contends that Qwest's argument that the Board provided a remedy for all the calls at issue is misleading. According to RIITA, the IUB has demonstrated it does not agree with Qwest's reading of its orders when it dismissed an arbitration attempt by rural carriers recently.[56] *Order Granting Motion to Dismiss, In re Iowa Telecommunications Association v. Verizon Wireless*, Docket No. ARB–04–3 (SPU–00–7), at p. 8 (dismissing

---

**53.** The Board stated that "if the CMRS carriers wish to exchange traffic with the [ILECs], there must be an agreement or other arrangement to specify the terms and conditions applicable to the exchange. In order to initiate those negotiations, it appears the CMRS carriers must make a bona fide request of each PTC." *IUB Proposed Decision*, at 33.

**54.** On questioning, Verizon stated it had sent only two BFRs. Meanwhile, Sprint PCS stated it understood it was not required to respond to BFRs from wireline carriers because a wireless carrier is not a "local exchange carrier under the Act," *see* 47 U.S.C. § 153(26), and that it had no intention of sending BFRs

to any company unless the company billed Sprint. RIITA argues the record contains no evidence that Sprint has issued any BFR to any rural wireline carrier.

**55.** *See* discussion related to scope of judicial review of administrative actions *supra*, at Analysis section A.1.

**56.** Furthermore, RIITA asserts the Board questioned whether it had authority to arbitrate any dispute under its SPU–00–7 orders in an earlier order in that case. *See Order Waiving 199 IAC 38.7(3) and Requiring Responses and Replies.*

claim for retroactive compensation for lack of jurisdiction because it was not a request to determine a rate, term, or condition of interconnection).

Qwest counters that there is no merit to RIITA's claim that the Board should have allowed terminating LECs to impose above-cost long distance access charges on Qwest for local calls placed by subscribers of third-party carriers on the ground that all the wireless carriers had not made BFRs to all Iowa Independent LECs prior to the Board orders at issue.[57] Prior to the Board's order, Iowa Independent LECs had no interest in negotiating agreements for cost-based reciprocal compensation with carriers indirectly connected to them through Qwest since the Independent LECs believed they could collect above-cost access charges from Qwest and avoid compensating wireless carriers for calls placed to wireless subscribers by the subscribers of the Iowa Independent LECs. Qwest contends that under such a structure, additional BFRs would have been futile.[58]

Qwest asserts it would be arbitrary and capricious to penalize Qwest for the inaction of third parties. Equally important, Qwest contends that requiring Qwest and its end-user customers to bear the costs of calls placed by subscribers of other carriers would be contrary to the cost causation principles underlying the FCC's intercarrier compensation rules and policies. Qwest maintains that RIITA is unable to show any court or agency has permitted a terminating LEC to collect access charges from a transiting carrier for intraMTA calls, even in the absence of BFRs by the originating carriers.

Finally, Qwest contends RIITA's assertion that the Board's ruling will inhibit BFRs and negotiations is equally meritless. As noted, the Board expressly stated that if CMRS carriers wish to exchange traffic with the Iowa Independent LECs, they must make a BFR of each LEC.[59] *IUB Proposed Decision*, at 33. Qwest argues that this indicates the Board believed its orders would stimulate, not inhibit, negotiations and agreements and that such "predictive judgment" within its area of expertise is entitled to deference by this Court. *See SWBT v. FCC*, 153 F.3d at 547 (finding "judicial deference to agency action is 'especially important' when agency's judgments are predictive'") (citations omitted).

The IUB submitted argument to refute RIITA's claims that the Board's order "inhibits bona fide requests and negotiations." The IUB claims that since the Board issued its decision in the *Transit Traffic* docket, over 70 negotiated interconnection agreements dealing with precisely the traffic at issue here have been filed with the Board.[60] The IUB asserts that negotia-

---

**57.** Qwest maintains the record before the Board shows several large wireless carriers made requests to several Iowa Independent LECs but were rebuffed.

**58.** This is evidenced by the responses of the LECs to BFRs received prior to the Board's ruling.

**59.** In addition, in its supplement to the Court, Qwest provides documentation that the leading trade association of wireless carriers, the Cellular Telecommunications and Internet Association ("CTIA"), filed a document in an FCC proceeding stating that "[r]ural LECs have *legally enforceable* right to demand good

faith negotiations and a remedy if wireless carriers fail to comply." *See* CTIA, *Intercarrier Compensation Reform Principles, Wireless Termination Tariffs, Rating and Routing Points*, CC Docket No. 01–92, at 9 (FCC Jan. 28, 2005). Qwest asserts this directly contradicts RIITA's argument that the IUB orders are unlawful and unworkable because the originating CMRS providers are under no legal obligation to negotiate agreements with rural LECs and other carriers involved in the transport and termination of calls placed by their end-user customers.

**60.** The Board has submitted no documentation verifying these numbers, and the Court

tions have obviously not been inhibited when they have resulted in over 70 agreements in a 2½-year time span.[61]

Finally, the IUB contends RIITA misreads and twists its decision in *Order Granting Motion to Dismiss, In re Iowa Telecommunications Association v. Verizon Wireless* as indicating the Board does not believe it provided a remedy for calls prior to the date of negotiations. The IUB explains that this decision concerned the 70 negotiated agreements described above. In negotiating those agreements, the parties addressed all interconnection issues except for the retroactive compensation issue. *Order Granting Motion to Dismiss, In re Iowa Telecommunications Association v. Verizon Wireless*, Docket No. ARB–04–3 (SPU–00–7). The rural carriers then filed a petition for enforcement asking the Board to decide that the single issue of retroactive compensation standing alone. *Id.*

The Board granted a motion to dismiss, finding that "[w]hat the Petitioners have brought to the Board is, in effect, a request that either the agreement [they have negotiated] be amended to include a term that was not agreed to, or that the Board arbitrate a separate agreement that includes only one term, that of past compensation." *Id.* According to the Board, in essence the rural carriers gave the issue away in order to negotiate an agreement and then sought arbitration to resolve the issue in their favor and add it to the negotiated agreements. The Board contends it properly rejected this attempt to reopen the negotiated interconnection

agreements and add terms the parties had not negotiated.

In the *T–Mobile Wireless Compensation Order*, the FCC amended its rules "to clarify that an incumbent LEC may request interconnection from a CMRS provider and invoke the negotiation and arbitration procedures set forth in section 252 of the Act." *T–Mobile Wireless Compensation Order*, at ¶¶ 9, 16. The FCC further requires that "[a] CMRS provider receiving such a request must negotiate in good faith and must, if requested, submit to arbitration by the state commission." *Id.* at ¶ 16. This ruling overcomes the contentions that the Commission's rules fail to specify the mechanism by which LECs may obtain compensation from CMRS providers and that CMRS providers "lack incentives to engage in negotiations to establish reciprocal compensation arrangements." *Id.* at ¶ 15 and n. 60–61. The Court also finds the Board's decisions regarding payment for terminating traffic, i.e., that the LECs are entitled to payment but from the originating carriers and that any agreement would be retroactive, is consistent with the cost-causation principles espoused by the FCC.

Based on these determinations, the Court finds RIITA's contentions with regard to the unavailability of BFRs or unsuitable rates to be without merit. Again, the Court regards the relevant FCC determinations in the *T–Mobile Wireless Compensation Order* as clarifying existing law. In any event, the Court holds the Board was within its authority and power to ren-

---

relies more on the expertise of the Board in projecting the effects of its rulings.

**61.** The Court notes that this is outside the record. It is, however, a useful bit of information that supports the IUB's decisions. The Court accepts this information on that basis as RIITA opened the door by referencing the *Order Granting Motion to Dismiss, In*

*re Iowa Telecommunications Association v. Verizon Wireless*, Docket No. ARB–04–3 (SPU–00–7), which compelled a response from the Board regarding the circumstances of that matter. As a result, the Court allows the discussion of the later negotiated agreements though the absence of such evidence would not have altered the Court's ultimate determinations.

der the decisions at issue here, and the Board's determinations do not violate federal law. Accordingly, the Court concurs with the strong suggestion of the IUB that the parties should seek to negotiate reciprocal compensation arrangements covering the traffic at issue in the present dispute. In the absence of the appropriate BFRs from CMRS providers, RIITA may request interconnection from the CMRS providers and invoke the negotiation/arbitration procedures pursuant to the 1996 Act and the Board's determinations. If these negotiations fail, arbitration before the IUB is the appropriate remedy.

## D. Rural Carrier Exemption

■ Qwest next asserts the Board's decisions do not violate section 251(f) of the Act by requiring rural telephone companies to negotiate interconnection with other companies. Section 251(f) exempts rural telephone companies, as defined in 47 U.S.C. § 153(37), from the duties of section 251(c) until the state commission removes the exemption upon making certain findings.[62] *See* 47 U.S.C. § 251(f)(1). Decisions by state commissions under this section must be made on a case-by-case basis. *Local Competition Order*, at ¶ 1252. Further, Qwest argues this section provides no exemption from the reciprocal compensation provisions of section 251(b), section 252, or the FCC's pre- and post–1996 Act decisions requiring that compensation for the termination of intraMTA and other local calls be established pursuant to interconnection agree-

ments. *Id.; see also* 47 U.S.C. § 252 (referencing interconnection pursuant to section 251 as the subject of an interconnection agreement); *Local Competition Order,* at ¶¶ 1022–25 (providing LEC–CMRS interconnection rates are the subjects of sections 251 and 252).[63]

Qwest contends that the Board's decision was authorized by sections 251(a), 251(b)(5), and 252, and thus the Board was correct in holding the rural exemption inapplicable. The 1996 Act provides no relief from the provisions of section 251(b) absent an affirmative order of the state commission issued in response to a petition by particular ILEC, which order must contain certain specified findings.[64] 47 U.S.C. § 251(f)(2).

In its proceeding, the Board found the "[i]ndependent LECs have not proven they are entitled to assert the [rural] exemption and no evidence has been offered regarding potential adverse economic impact on users, economic burdens on the LECs, technical feasibility, or the public interest, convenience and necessity." *IUB Order Affirming Proposed Decision,* at 14. The Board expressly noted it would consider the statutory definitions and factors governing the applicability and removal of the exemption if and when such a claim were made and disputed. *Id.* (citing *IUB Proposed Decision,* at 13). Accordingly, Qwest contends the Board's treatment of the rural exemption issues should be upheld.

**62.** The FCC has held that the rural exemption is the "exception, rather than the rule," and should apply only to the extent, and for the period of time, that is justified by "policy considerations." *Local Competition Order,* at ¶ 1262.

**63.** In addition, prior to the 1996 Act, the FCC required all LECs, regardless of size, to negotiate interconnection agreements with CMRS providers. *See* discussion *supra,* at footnote

20. The 1996 Act expressly left in place the pre-Act decision by the FCC under section 201. *See* 47 U.S.C. § 251(I).

**64.** Such findings include, but are not limited to, the size of the petitioning carrier, the impact of the statutory requirements on the petitioning carrier, and the projected impact of the requested order on the public interest. *See* 47 U.S.C. § 251(f)(2).

RIITA emphasizes that rural telephone companies are exempt from the duty to negotiate pursuant to section 251(c) and the duty to interconnect their local network for transmission and routing of traffic pursuant to section 251(c)(2). RIITA counters Qwest's contentions by claiming Qwest failed to mention the first requirement for lifting the rural exemption found in section 251(f). RIITA points out that the first requirement is that the rural carrier receive a BFR for interconnection. *See* 47 U.S.C. § 251(f)(1)(A). RIITA argues that the Board's order, by requiring rural telephone companies to accept traffic in the absence of BFRs, forces rural companies to waive its section 251(f) exemptions because it deprives the companies of their opportunity to assert the rural exemption.

RIITA further acknowledges that rural telephone companies are not exempt from the duty to interconnect under section 251(a)(1), but notes, however, that the duty to interconnect only requires a physical interconnection and not an exchange of traffic. *See AT & T Corp. v. FCC*, 317 F.3d at 234–35. Also, while rural carriers are not exempt from the duty to exchange local traffic, RIITA asserts wireless carriers would first need to serve BFRs to raise that issue.

The IUB notes RIITA does not dispute the Board finding that no carrier in the Board's proceeding demonstrated it qualified for the so-called "rural exemption" under the standards set forth in section 251(f), and RIITA's claims that the Board's decision "deprives the companies of their opportunity to assert the exemption" is simply inaccurate. The Board's orders expressly confirm that incumbent LECs may assert the exemption in response to a BFR by a wireless carrier, and that the Board would rule on the applicability and removal of the exemption "if and when" such an assertion was "made and

disputed." *Order Affirming Proposed Decision*, at 14; *Proposed Decision and Order*, at 33.

The Court finds this issue is simply not ripe for determination by this Court. The Board holds the authority and expertise to address the issue but has not yet been afforded the opportunity. The Board's determinations thus far regarding the applicability of the rural carrier exemption have been consistent with federal law. RIITA cannot have been deprived of its right to assert the exception before it has even attempted to make such assertion before the Board, and the Court finds nothing in the Board's decisions that will prevent RIITA or other incumbent LECs from doing so.

### E. RIITA's Takings Claim

RIITA claims in its Complaint that the IUB's order constitutes an unconstitutional taking of property. Qwest asserts that RIITA cannot state such a claim because the Board has yet to determine the rate that would apply to the termination of intraMTA calls.

The U.S. Constitution prohibits only the taking of property "without just compensation." U.S. Const. amends. V, XIV. The orders of the IUB at issue here provide that the terminating carriers will receive compensation pursuant to agreements negotiated with the CMRS providers (or arbitrated by the Board if the parties are unable to agree). The orders do not, however, establish the amount of compensation. Qwest contend this fact is fatal to RIITA's takings claim.

In rejecting a challenge to FCC regulations regarding the prices for interconnection and other items required by the 1996 Act, the Supreme Court stated "the general rule is that any question about the constitutionality of rate setting is raised by rates, not methods." *Verizon Communi-*

*cations, Inc. v. FCC,* 535 U.S. 467, 525, 122 S.Ct. 1646, 152 L.Ed.2d 701 (2002); *see also Federal Power Comm'n v. Hope Natural Gas Co.,* 320 U.S. 591, 602, 64 S.Ct. 281, 88 L.Ed. 333 (1944) ("It is not theory but the impact of the rate order which counts. If the total effect of the rate order cannot be said to be unreasonable, judicial inquiry ... is at an end. The fact that the method employed to reach that result may contain infirmities is not then important."). In this case, the Board has neither set a rate for termination of intraMTA calls nor a methodology for calculating such a rate. Qwest argues there can be no challenge to the constitutionality of the Board's orders as a result. *See Duquesne Light Co. v. Barasch,* 488 U.S. 299, 310, 109 S.Ct. 609, 102 L.Ed.2d 646 (1989).

In addition, Qwest contends that while this Court need not reach the issue, RIITA's Complaint forecloses any claim that the Board's orders are "so unjust as to be confiscatory." *Id.* at 307. To satisfy this standard, RIITA must show the Board's orders will "jeopardize the financial integrity of [its LEC members], either by leaving them insufficient operating capital or by impeding their ability to raise future capital," or will be "inadequate to compensate current equity holders for the risk associated with their investments under a modified prudent investment scheme." *Id.* at 312.

RIITA claims a potential loss to Iowa Independent LECs to be $2.5 million annually in switched access revenues as a result of the Board's decision. Qwest argues this computation improperly assumes the LECs will receive no compensation for the traffic for which they believe they are entitled to collect charges for switched access charges, despite the Board's orders that CMRS providers compensate the terminating LECs. Moreover, RIITA is unable to show the claimed loss belongs solely to RIITA's members[65] and not other LECs, and that even if it does, the result is an approximate $19,000 loss for each RIITA member on an annual basis. Qwest argues this clearly falls short of satisfying the *Duquesne Light* standard.

RIITA counters that it has claimed— and would show at trial[66]—that its members have received no compensation. RIITA asserts Qwest is incorrect in its calculations used to support the argument that any injury to RIITA is de minimus. RIITA claims that the $2.5 million amount listed in its Complaint was made only to show the amount in question was substantial, and that the actual loss would be much higher. In fact, RIITA asserts the injury would be approximately $16.00 per access line, and while RIITA members have a total of about 156,000 lines, Qwest has about one million lines. Thus, according to RIITA, the annual loss will be closer to $16 million. Regardless, RIITA contends that even a loss of $19,000 per year could be devastating to a company that has only one employee.[67]

In its reply, the IUB presents that RIITA does not address the primary argument in favor of summary judgment on this issue, that is, that courts will not reach takings claims until rates have been set. The Board orders challenged by RIITA, like the Act itself, expressly provide for a negotiations/arbitration process pursuant to which its members may obtain compensation for terminating intraMTA calls

---

65. RIITA has approximately 130 members.

66. Since this action is a judicial review of agency action, there is a substantial issue of the availability of a trial. *See* discussion *supra,* at Analysis section A.1.

67. RIITA contends the loss amounts could be even higher and provides as an example an affidavit claiming the East Buchanan Telephone Cooperative has suffered losses of $100,000 per year since the IUB ruling.

placed by subscribers of wireless carriers, but the Board's orders did not establish the amount of compensation. In this circumstance, the Board contends that a takings claim is fatally premature. *See Verizon Communications, Inc. v. FCC,* 535 U.S. at 525, 122 S.Ct. 1646.

The Court finds RIITA's allegations of a takings violation are not ripe for review. RIITA's contentions on this issue are, in fact, fatally premature, as the Board did not set applicable rates in any of its decisions. Furthermore, the Board's decision attempts to provide adequate intermediate compensation based on the subsequently negotiated agreements. Until the parties have negotiated and/or arbitrated a reciprocal compensation agreement, and the Board has been given opportunity to review those agreements, RIITA's takings claim is premature and must be dismissed.

## CONCLUSION

In a case as highly technical and complex as this, the Court gives respectful consideration to the determinations made by a singularly specialized body such as the IUB. The Court recognizes the expertise of the IUB in addressing the details of intrastate telecommunications issues and in examining the role of state commissions under the 1996 Act. That said, this Court examines the Board's determinations to assess whether any of those conclusions violated federal law. The Court finds for the reasons set forth above that the Board's decision does not violate federal law, either the pertinent sections of the 1996 Act or the implementing decisions of the FCC. Moreover, the Court finds the result of the IUB's decision is entirely consistent with the relevant federal law and essentially promotes the goals of the 1996 Act and the administrative rules arising pursuant to the Act. The Court further finds the decisions of the IUB inherently logical and appropriate to resolve the issues raised before that body.

Accordingly, the motion for summary judgment filed by Qwest (Clerk's No. 51) and joined by the Board (Clerk's No. 53) must be granted. In so doing, the Court dismisses all challenges in RIITA's Complaint to the lawfulness under the Communications Act of 1934, as amended by the Telecommunications Act of 1996, of decisions by the IUB in its Docket No. SPU–00–7 regarding the intercarrier compensation for the termination by ILECs of intraMTA calls placed by subscribers of third-party wireless carriers to the ILECs' subscribers. This action is dismissed. The Clerk of Court is directed to enter judgment in favor of the Intervenor and the Defendant, and against the Plaintiff.

IT IS SO ORDERED.